**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 13 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

TIMOTHY GAMBLE,

        Petitioner-Appellant,

v.

SAM CALBONE, Warden,

        Respondent-Appellee.

No. 03-6057

---

KENNETH POPEJOY,

        Petitioner-Appellant,

v.

RON WARD, Warden; THE
ATTORNEY GENERAL OF THE
STATE OF OKLAHOMA,

        Respondents-Appellees.

No. 03-6150

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. Nos. CIV-02-678-W & 02-CV-1492)**

---

Submitted on the briefs:

Timothy Gamble, Pro Se (No. 03-6057).

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer J. Dickson, Assistant Attorney General, Oklahoma City, Oklahoma, for Respondent-Appellee (No. 03-6057).

Kenneth Popejoy, Pro Se (No. 03-6150).

W.A. Drew Edmondson, Attorney General of Oklahoma, Keeley L. Harris, Assistant Attorney General, Oklahoma City, Oklahoma, for Respondents-Appellees (No. 03-6150).

---

Before **EBEL** , **HENRY** , and **MURPHY** , Circuit Judges.

---

**MURPHY** , Circuit Judge.

---

Timothy Gamble and Kenneth Popejoy, Oklahoma state inmates appearing pro se, appeal from the district court's denial of their habeas petitions brought pursuant to 28 U.S.C. § 2241. The petitions alleged violation of the inmates' Due Process rights because respondent revoked their earned credits in prison disciplinary proceedings for criminal acts they did not commit. In each case, we granted a certificate of appealability (COA) on the issue whether some evidence supports their disciplinary convictions for violation of Okla. Stat. tit. 21, § 1541.1. In Mr. Popejoy's case, we also granted COA on the issue whether copy fees charged by a district court to obtain a criminal record and transcript to be used in preparing and filing an application for post-conviction relief are "fees or costs" within the meaning of Okla. Stat. tit. 57, § 549(A)(5) that may be paid

from an inmate's mandatory savings. Because the facts and law in each case are virtually identical, we have combined the cases for judicial economy. And because we determine that no evidence supports the disciplinary convictions, we reverse and remand for issuance of the writ in both cases. [1]

## I. Relevant facts and proceedings

The following facts, many of which were found by the district court, are undisputed in the record. Both inmates are incarcerated at the Great Plains Correctional Facility, a private prison. [2] Section 549(A)(5) [3], in pertinent part, requires that at least twenty percent of an inmate's wages derived from prison employment

> shall be placed in an account, payable to the prisoner upon his or her discharge or upon assignment to a prerelease program. Funds from

---

[1] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of these appeals. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The cases are therefore ordered submitted without oral argument.

[2] Mr. Calbone, warden of Great Plains, was named as the respondent by both Mr. Gamble and Mr. Popejoy. In Mr. Popejoy's case, because the Oklahoma DOC bears responsibility for the custody and supervision of inmates housed in private prisons, the magistrate judge substituted Ron Ward, the Director of the DOC, as the proper respondent. R. No. 03-6150, Doc. 14 at 1 n.1. The Oklahoma Attorney General represented both respondents, and we refer only to "respondent" in this order.

[3] Section 549 "enumerates the powers and duties of the State Board of Corrections," *Webb v. Maynard*, 907 P.2d 1055, 1057 (Okla. 1995), and creates statutory limits on the collection, apportionment, and disbursement of wages paid for inmate employment. *See id.*

> this account may be used by the inmate for fees or costs in filing a civil or criminal action as defined in Section 151 et seq. of Title 28 of the Oklahoma Statutes.

This account is referred to as the "mandatory savings account." The correlative Oklahoma Department of Correction's (DOC) policy states:

> Except for fees incurred by an inmate filing any state or federal action, statutory savings cannot be drawn upon until the inmate discharges, paroles, or upon assignment to a community based supervision program. (57 O.S. Section 549). The allowable fees are defined in O.S. 28, Section 151 et seq. . . . Attorney fees are not an allowable fee. Disbursements for filing fees must be made payable to the applicable county or federal court clerk. Any court order to release funds from statutory savings for any purpose other than filing fees will be referred immediately to the legal division.

DOC policy OP-120230 (1999-2001). In 1999, Travis Smith, who at that time was the business manager at Great Plains (and who later became a deputy warden) sent a memo to the general inmate population briefly stating his interpretation of section 549(A)(5) and OP-120230. In a footnote, the memo quoted the portion of OP-120230 set forth above, but Mr. Smith informed the inmates that, "OP 120230 . . . states that only court-ordered filing fees may be paid from mandatory savings." R. No. 03-6057, Doc. 2, Ex. K. The memo instructed inmates who desired a qualifying disbursement to complete a request to staff at the DOC, and to include a copy of the court order with an envelope addressed to the court "you will be paying." *Id.*

On October 17, 2001, Mr. Gamble sent a written "Request to Staff" to the DOC asking staff to withdraw $500.00 from his mandatory savings account. The check was to be made payable, and sent directly, to the Canadian County Clerk. He included a letter to the clerk authorizing payment of the costs to obtain certified copies of the transcript and record in his criminal case so that he could prepare and file an application for state post-conviction relief.

On October 10, 2001, Mr. Popejoy sent a similar request, asking that $170.00 be sent to the Oklahoma County Court Clerk to obtain court documents and transcripts relating to his criminal conviction. He demonstrated that he had previously filed a motion with the district court in Oklahoma County on August 3, 2001, requesting copies of his criminal record and transcript, along with an affidavit claiming pauper status, but had received no response after almost three months. R. No. 03-6150, Doc. 2, Ex. A.

Both petitioners assert that prison law clerks told them that, under the statute and DOC policy, they could request money from their mandatory savings to pay for the copy costs. The DOC did not issue a check in response to either request. Instead, on October 24, Great Plains prison officials commenced disciplinary proceedings against them, charging both inmates with violating section 1541.1 of the Oklahoma criminal statutes, which prohibits "[o]btaining money under false pretense." R. No. 03-6057, Doc. 2, Ex. A; R. No. 03-6150,

Doc. 2, Ex. E.  The sole evidentiary basis for each charge was a copy of the inmate's request.  Both inmates challenged the charges.

At a November 1 hearing, both inmates admitted requesting money from their mandatory savings to pay for certified copies of their court records but contended they did not violate the law.  Quoting Mr. Smith's memo, the disciplinary hearing officer who presided over both cases maintained that prison policy "states that only court ordered filing fees may be paid from mandatory savings."  R. No. 03-6057, Doc. 2, Ex. E; R. No. 03-6150, Doc. 2, Ex. L.  He concluded that Mr. Gamble's behavior was "an attempt to obtain money under false pretense," R. No. 03-6057, Doc. 2, Ex. E, and that Mr. Gamble had therefore violated section 1541.1 and committed a class X offense. [4]  The officer imposed punishment of thirty days' disciplinary segregation and 365 days of lost earned credits.  *See id.*

The officer made no comments about Mr. Popejoy's alleged misconduct other than to also find him guilty of the class X offense for violating section 1541.1.  R. No. 03-6150, Doc. 2, Ex. E, L.  He imposed thirty days of disciplinary

---

[4]      Class X offenses form the most serious class of prison misconduct and, besides disciplinary convictions for violation of specific city, state, or federal laws, include offenses like rioting; taking over a part of the prison; resisting apprehension within the prison; selling drugs; threatening prison security; killing, raping, or intentionally harming others; setting fires; possessing weapons, firearms or drugs; and escape.  OP-060125 Attach. A.  Only class X offenses may result in the maximum 365-day loss of earned credits.      *Id.* at p. 8.

segregation and a loss of 180 days earned credits as punishment.        *Id.* Ex. L.

Mr. Popejoy complains that he was also punished with seven additional administrative disciplinary sanctions not imposed in his misconduct decision, including loss of telephone, visitation, canteen, recreation and exercise privileges; loss of wages; demotion from classification level 4, where he was earning forty-four days of credit per month toward reduction of his sentence to level 1 where he could earn no credits; and removal from his level-four honor pod to a level-one pod.

Both inmates administratively appealed their misconduct convictions. Both argued (1) they could not prepare and file applications for post-conviction relief without copies of their criminal record and transcript to support the petitions; (2) Travis Smith's memo misinterpreted section 549(A)(5) and OP-120230; (3) Oklahoma statutes specifically define copy costs as "fees" that may be paid from mandatory savings; (4) Oklahoma case precedent provided for payment of copies of the criminal record from their mandatory savings account; (5) they used the proper method in requesting the money from the DOC; (6) they had no intent to defraud or cheat anyone by asking for money from their own savings; and (7) no evidence supported a disciplinary conviction for violation of section 1541.1.

In Mr. Gamble's case, the designee for the Director deciding the appeal responded, "Oklahoma State Statute 57 O.S. Section 549 states, 'Except for fees incurred by an inmate filing any state or federal action, statutory savings cannot be drawn upon until the inmate discharges, paroles, or upon assignment to a community based supervision program.'" R. No. 03-6057, Doc. 2, Ex. I. Contrary to the designee's statement, the quoted language she attributed to section 549 does not appear in the statute, and it has not been amended since 1996. [5] In Mr. Popejoy's case, the designee properly attributed that language to DOC policy OP-120230. R. No. 03-6150, Doc. 2, Ex. P. But in both cases, she interpreted the words "fees incurred by an inmate filing any state . . . action" to mean that only "filing fees" could be paid from a mandatory savings account. She determined that Mr. Gamble had failed to prove that he requested the money to pay for filing fees; that Mr. Popejoy had failed to prove he requested and intended to use the money to pay for *court-ordered* filing fees; and that there was no indication that either inmate owed money for filing fees. *See id.*; R. No. 03-6057, Doc. 2, Ex. I. She further concluded that section 549 "prohibited" using mandatory savings to pay for certified copies of a criminal

---

[5] The designee apparently was quoting the language from Mr. Smith's memo, which quotes the 1999-2001 version of DOC policy OP-120230 at paragraph C.2. Aplee. Br. No. 03-6150, Ex. C. That paragraph explains the methodology for cash disbursements and is similar to the current version. *See* OP-120230, found at http://www.doc.state.ok.us/Offtech/op120230.htm.

record.  R. No. 03-6057, Doc. 2, Ex. I.  Without addressing their claims that there was no evidence of an intent to cheat or defraud anyone, the Director's designee concluded there was sufficient evidence to support the charges that both inmates violated § 1541.1, and denied the appeals.      *See id.* ; R. No. 03-6150, Doc. 2, Ex. P.

Both inmates filed habeas petitions in federal district court.  In both cases, the district court denied the petitions, concluding that the disciplinary actions based on violation of § 1541.1 were supported by "some evidence." R. No. 03-6057, Doc. 16 at 1-2; R. No. 03-6150, Doc. 16 at 1 (adopting magistrate judge's report and recommendation) & Doc. 14 at 8 (magistrate judge's report concluding that "some evidence" supported conviction).

## II.  Exhaustion of state-court remedies

Generally, before a habeas petition may be granted, a petitioner must demonstrate exhaustion of state court remedies unless "there is an absence of available State corrective process," 28 U.S.C. § 2254(b)(1)(B)(i), or "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(B)(ii).  Both magistrate judges assigned to the cases noted that respondent admitted there appeared to be no state-court remedy recognized in Oklahoma for immediate judicial review of the sufficiency of the evidence to support a prison disciplinary conviction.  R. No. 03-6057, Doc. 14 at 4-6; R. No. 03-6150, Doc. 14 at 4 & n.4.

We have previously held that an inmate seeking speedier, but not immediate, release due to alleged errors in calculating earned or good-time credits does not have an adequate habeas remedy under Oklahoma law, and that requiring state exhaustion would be futile. *Wallace v. Cody*, 951 F.2d 1170, 1172 (10th Cir. 1991); *and see Johnson v. Dep't of Corr.*, 916 P.2d 264, 266 (Okla. Crim. App. 1996) (holding that claims of due process violations were not proper subjects of state habeas relief because inmate could not show entitlement to immediate release). In 1996, the Oklahoma Court of Criminal Appeals further held that, although state mandamus relief is available to force a prison to provide an inmate with "minimum procedural due process" before revoking earned credits, mandamus is not available to review the actual decision of the disciplinary authority. *Canady v. Reynolds*, 880 P.2d 391, 396-97 & n.4 (Okla. Crim. App. 1994). The court has subsequently stressed that an inmate "cannot challenge the merits of, or appeal from, the prison officials' administrative decision that [the inmate] is guilty of prison infractions and that she should be punished by the revoking of earned credits" through mandamus because mandamus relief does not apply "to the full panoply of due process rights" in Oklahoma. *Dunn v. Ramsey*, 936 P.2d 347, 348-49 (Okla. Crim. App. 1997).

Nor does an Oklahoma inmate have the right to a direct judicial appeal from a disciplinary board or DOC decision to revoke credits. *Canady*, 880 P.2d at 398-99. In short, the *Canady* court held that "an inmate does not have a right to an interlocutory determination of the status of his earned credits in a situation where he is not entitled to immediate release," stating that it "refuse[d] to believe the [Oklahoma] Legislature intended this Court or any district court to become involved in the earned credits business," *id.* at 400. We continue to follow our ruling in *Wallace* that there is no state-exhaustion requirement for Oklahoma inmates challenging the merits of a disciplinary board revocation of earned credits where the inmate is seeking only speedier, and not immediate, release.

### III. Standard of review

On review of the denial of a petition for habeas corpus, we review the district court's legal conclusions de novo. *See Patterson v. Knowles*, 162 F.3d 574, 575 (10th Cir. 1998). When determining whether a disciplinary board decision should be upheld upon a challenge to the sufficiency of the evidence, we do not examine the entire record or weigh the evidence; we simply determine "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455-56 (1985). The conclusion reached by the disciplinary board is

that both inmates violated a state criminal law, thereby committing a class X offense that could be punished by revocation of earned credits.

## IV. Analysis of issues on appeal

There is no dispute that the inmates requested a disbursement from their savings accounts to pay court copy costs associated with the prospective filing of their state petitions for post-conviction relief. The ultimate legal question in these two cases is whether, by making this request, the inmates violated section 1541.1. We must first, however, ascertain the answers to two preliminary questions: what was the crime charged for the disciplinary conviction, and what are the elements of that crime?

**A. Crime charged.** Respondent states that Mr. Gamble "was found guilty of a misconduct for attempting to obtain money from his prison savings account for an improper purpose," which violated prison policy OP-120230. Aplee. Br. No. 03-6057, at 6. Respondent states that Mr. Popejoy's "misconduct report was written" because he "sought withdrawal of money from his account for an improper purpose." Aplee. Br. No. 03-6150, at 3. But, as previously mentioned, the record conclusively shows that the inmates were charged, convicted, and disciplined for violating a state criminal law prohibiting obtaining money under false pretense. Neither inmate was charged with violating OP-120230.

Further, OP-120230 does not impose any requirements on an inmate to ensure that his request is for an allowable expenditure or warn that an attempt to obtain money in savings by making a request that may be disapproved is a rule violation subject to prison discipline. Indeed, the 2001 policy provided that, after an inmate makes a request for disbursement, the "appropriate staff will approve or disapprove the disbursement request and forward to trust fund officer, or return to inmate if not approved." OP-120230(VII)(B)(1) (attached as Ex. C to respondent's brief in No. 03-6150). In addition, submitting a disapproved disbursement request is not an act that constitutes a rule violation under OP-060125; and only acts falling within this policy may provide the basis for discipline or the loss of earned credits. [6]

Just as section 549 "enumerates the powers and duties of the State Board of Corrections," *Webb*, 907 P.2d at 1057, OP-120230 simply sets forth the DOC's policy on use of inmate accounts in accordance with the statute. Thus, we must examine the actual basis of the inmates' disciplinary convictions, which is violation of section 1541.1, and determine whether "some evidence" supports a finding that the inmates committed that crime.

---

[6] OP-060125 provides that, "'Acts Constituting Rule Violation' (Attachment A . . .) of this procedure defines all inmate/offender disciplinary rule violations and specifies the allowable range of disciplinary sanctions authorized by the Oklahoma Department of Corrections for each violation." http://www.doc.state.ok.us/Offtech/op060125.htm.

**B. Elements of the crime charged.** Section 1541.1 provides, in relevant part:

> Every person who, with intent to cheat and defraud, shall obtain or attempt to obtain from any person, firm or corporation any money, property or valuable thing, of a value less than Five Hundred Dollars ($500.00) by means or by use of any trick or deception, or false or fraudulent representation or statement or pretense . . . shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine not to exceed One Thousand Dollars ($1,000.00) or by imprisonment in the county jail for not more than one (1) year, or by both such fine and imprisonment.

In order to affirm a conviction for obtaining money by false pretense, there must be evidence that the inmates attempted to obtain money by means of a trick, deception, or false representation. It is necessary that they *knew* it was a trick, deception, or false representation, and that they had the intent to cheat and defraud. *See* OUJI-CR 5-41. If, as here, the defendant is accused of making a false representation, it must be about "past or existing facts by one person to another with intent to defraud; such statement must be reasonably calculated to deceive that other." *Bartlett v. State*, 733 P.2d 1350, 1352 (Okla. Crim. App. 1987) (quotation omitted) (interpretation of holding limited on other grounds in *Broadway v. State*, 818 P.2d 1253, 1255 n.1 (Okla. Crim. App. 1991)). Intent to defraud is defined as a "[s]cheme to take property so as permanently to deprive the owner." OUJI-CR 5-56; *and see Warren v. State*, 226 P.2d 320, 321 (Okla. Crim. App. 1950) (noting that "if the owner parts with the possession and

-14-

title [of property], due to the deception and artifice of the taker, then the offense constitutes obtaining property by false pretenses"). "Fraudulent intent . . . [may] be inferred from a series of acts and pertinent circumstances." *Ross v. State*, 572 P.2d 1001, 1003 (Okla. Crim. App. 1977). But absent evidence of an intent to defraud, a conviction under section 1541.1 must be reversed. *Hixson v. State*, 598 P.2d 268, 268-69 (Okla. Crim. App. 1979) (interpretation of holding limited on other grounds in *Broadway*, 818 P.2d at 1255).

**C. The district court's analysis.** Respondent does not discuss the elements of section 1541.1. Instead, he argues, both here and below, that the act of making application for the disbursement, in and of itself, violates section 1541.1.

The district court agreed, adopting the two magistrates' reports and recommendations. In arriving at this conclusion in both cases, the magistrate judges first noted that section 549(A)(5) provides that funds from an inmate's mandatory savings account "may be used by the inmate for fees or costs in filing a civil or criminal action as defined in Section 151 et seq. of Title 28 . . . ." R. No. 03-6057, Doc. 14 at 7 (quoting section 549(A)(5)); R. No. 03-6150, Doc. 14 at 7. Then the judges noted that, under the prison policy, "[f]unds in an inmate's mandatory savings account may only be used 'to pay court costs payable to a county clerk.'" R. No. 03-6057, Doc. 14 at 8 (quoting OP-120230(V)(A)(2));

-15-

R. No. 03-6150, Doc. 14 at 7. Without further analysis, the magistrate judges concluded that copying costs imposed by a court clerk for supplying a criminal record to be used to prepare a post-conviction application for relief do not qualify as costs or fees for filing a civil or criminal action under section 549(A)(5). Both magistrate judges then concluded that the inmates attempted to obtain the funds for a personal purpose that is not allowed under statute or DOC policy, and that this provided "some evidence" of an intent to use funds for an impermissible purpose through trick or deception and, therefore, provided sufficient proof of violation of section 1541.1. R. No. 03-6057, Doc. 14 at 9; R. No. 03-6150, Doc. 14 at 8.

The magistrate judge in Mr. Popejoy's case also found persuasive that, in *Hammons v. Ward*, No. 02-6326, 2003 WL 1849344 (10th Cir. April 10, 2003) (unpublished), a panel of this court denied a COA to review the district court's denial of a habeas petition in a case involving similar facts and charges. And on appeal, respondent also cites *Farrow v. Ward*, No. 02-6318 (10th Cir. June 13, 2003) (unpublished), as persuasive authority. But "unpublished decisions are not binding authority," *Duran-Hernandez v. Ashcroft*, 348 F.3d 1158, 1162 (10th Cir. 2003). We further note that certain facts are different in the *Farrow* case, and it is sufficiently distinguishable that we do not regard it as persuasive authority. *See United States v. Salzano*, 158 F.3d 1107, 1112 (10th Cir. 1998). In denying

COA, *Hammons* did not fully address the statutes and case law we are concerned with here, nor did it discuss the issue of intent to cheat and defraud. For these reasons, we decline to follow it. *See Shayesteh v. City of South Salt Lake*, 217 F.3d 1281, 1285 n.6 (10th Cir. 2000); *Day v. Maynard*, 200 F.3d 665, 667 n.1 (10th Cir. 1999).

**D. Section 549(A)(5).** As Mr. Gamble and Mr. Popejoy point out, section 549(A)(5) specifically provides for payment of "fees or costs," as defined by Okla. Stat. tit. 28, § 151, and not just "filing fees." Section 151(A) provides that district court clerks shall charge and collect fees, fines, costs, and assessments imposed by "this title," i.e., title 28.

Okla. Stat. tit. 28, § 31 provides, in relevant part:

the clerk of the district court . . . shall charge and collect the following *fees* for services by them respectively rendered and none others, except as otherwise provided by law:
. . . .
Making copy of an instrument of record or on file, first page ............................................................ $1.00
subsequent pages (each) ............................................... $0.50
Certifying to any instrument (each) .................................. $0.50

Thus, the terms "fees or costs," as defined in section 549(A)(5), reasonably appear to include photocopy charges imposed by a court clerk for obtaining official records and transcripts.

Respondent argues that, because section 549(A)(5) limits inmate use to fees or costs "in filing" their civil or criminal actions, the terms "fees or costs" is

-17-

limited to only "filing fees." Respondent, however, fails to address the express language specifically allowing disbursement for "costs," and interpreting "fees or costs" to mean only "filing fees" would seemingly eliminate other types of expenditures incurred under title 28 "in filing" a suit.

The inmates' understanding that requesting disbursement from their mandatory savings for the costs of obtaining their transcripts was a legal request is justified under Oklahoma case precedent and legislative history. In 1985, section 549 did not expressly provide for any pre-discharge use of an inmate's mandatory savings account. *See Cumbey v. State*, 699 P.2d 1094, 1095 (Okla. 1985) (quoting former statute, then codified as Okla. Stat. tit. 57, § 549.5 as providing, "that not less than twenty percent . . . of such wages shall be placed in an account payable to the prisoner upon his discharge"). The inmates in *Cumbey* challenged as unconstitutional the apparent prohibition on withdrawing money from their mandatory savings for personal and family purposes "and to pay court costs and filing fees." *Id.* at 1096. The court held that the inmates did not have a constitutional or legal right to immediate use of the money in their savings because the former statute gave them only a conditional right to receive the savings upon their discharge. *See id.* at 1097-98.

But the *Cumbey* court denied the inmates' applications to proceed *in forma pauperis* on appeal and directed the DOC to release money from their mandatory

savings to pay not only for the costs of filing the appeal, but also "for costs of assembling the record on appeal," i.e., for the costs of copying the record. *Id.* at 1096. The court held that the inmates were not indigent by virtue of their mandatory savings accounts, and that money from those accounts could be released as costs were incurred "upon proper application and court order" notwithstanding the fact that section 549.5 provided only for payment of the funds to the inmates upon discharge. *See id.* The rationale for this holding was to

> curb the indiscriminate filing of prisoner civil rights actions, by prompting inmates to confront the initial dilemma which faces most other potential civil litigants: is the merit of the claim worth the cost of pursuing it?

*Id.*

In response to *Cumbey*, in 1985 the Oklahoma legislature passed a new law providing that, "[i]n determining whether or not an inmate shall be allowed to use an affidavit in forma pauperis, a court shall consider the amount of funds an inmate has on deposit with the Department of Corrections." Okla. Stat. tit. 57, § 565. The legislature also concurrently amended section 549 to specifically provide an inmate the right to use mandatory savings during incarceration to pay "for any fees or court costs incurred by an inmate filing any civil action." *Daniels v. Kaiser*, 851 P.2d 529, 531 (Okla. 1993) (quoting the November 1, 1985 amendment); *and see Foust v. Pearman*, 850 P.2d 1047, 1051 (Okla. 1992) ("Two days after the *Cumbey* decision, the Legislature amended title 57 to conform to

that holding.") (Hodges, J., concurring in part and dissenting in part). The Legislature amended section 549 again in 1990 to limit " *any* fees or court costs" to those "as defined in Section 151 of Title 28 of the Oklahoma Statutes." *Daniels* , 851 P.2d at 531 n.1 (quoting the 1990 amendment).

Until 1995, section 549 specifically limited the use of inmates' mandatory savings accounts to costs and fees associated with *civil* cases. *See id.* at 531. Accordingly, in a case decided in 1993, the Oklahoma Supreme court held that, although mandatory savings funds could be used to pay for "costs and expenses" associated with prosecuting a civil matter, they could not be used to prosecute an inmate's criminal appeal. *McMullin v. Dep't of Corr* ., 863 P.2d 1187, 1188-89 (Okla. 1993) (stating that, "§ 549.A.5 authorizes prisoners to use their trust funds, prior to release, only for costs in *civil* matters") (italics in original). The court affirmed the district court's refusal to order the DOC to release money from the inmate's savings account "to pay costs and expenses associated with the appeal of a conviction." *Id.* at 1189. But the court also held that the district court could not even consider the amount in the inmate's mandatory savings accounts in deciding whether the inmate was indigent and unable to pay "filing fees, other court costs, transcript costs, [and] other expenses" associated with prosecuting his criminal appeal. *Id.* The court held that the inmate could file a pauper's affidavit to force the state to pay for a transcript and other costs in either a criminal appeal

or when seeking post-conviction relief [7] in order to guarantee his access to the courts. *Id.*

In 1995 the Oklahoma legislature responded to *McMullin* by again amending section 549(A)(5) to include fees and costs associated with the inmate filing *criminal* cases. 1995 Okla. Sess. Law Serv. Ch. 266 § 4 (emerg. eff. May 25, 1995) (West). In addition, the legislature passed Okla. Stat. tit. 12, § 2003.1(C). That statute provided that all inmates desiring to proceed *in forma pauperis* had to submit certificates stating the amount of money on deposit to the inmate's credit "in *any* account in the institution," and further provided that a court may deny leave to proceed *in forma pauperis* if the *total* account values exceed $200. *See* 1995 Okla. Sess. Law Serv. Ch. 141 § 1 (eff. Nov. 1, 1995) (West) (emphasis added); *Smith v. Moore*, 50 P.3d 215, 218 n.4 (Okla. 2002) (quoting language of section 2003.1 as codified in 1995 [8]). These legislative amendments expressed Oklahoma's policy of "compelling a prisoner to weigh the validity of a lawsuit against the cost of pursuing it," *Smith*, 50 P.3d at 218, and

---

[7] "Actions brought pursuant to the Oklahoma Uniform Post Conviction Procedure Act are criminal actions." *Moore v. Gibson*, 27 P.3d 483, 485 (Okla. Crim. App. 2001).

[8] Section 2003.1(C) was amended in 2002 to delete the language specifying which accounts could be considered for pauper status, but, in the same legislation, the legislature concurrently passed another law that specifically sets forth what income and assets a court may consider in determining pauper status, including inmate trust fund accounts. 2002 Okla. Sess. Law Serv. Ch. 402, §§ 6 & 10 (eff. July 1, 2002); Okla. Stat. tit. 57, § 566.3(B)(3)(h).

forcing inmates to pay for all costs incurred in preparing and filing the case from the inmate's draw or mandatory savings accounts. *Cf. Williams v. Austin*, 890 P.2d 416, 418-19 & n.2 (Okla. Ct. App. 1994) (implicitly holding, in Open Records Act case, that mandatory savings account funds could be used to pay for the costs of obtaining copies of an inmate's criminal record needed in anticipation of filing an application for post-conviction relief).

Mr. Gamble and Mr. Popejoy established that their request for a disbursement from mandatory savings for fees charged by a court to copy and send their criminal records and transcripts was reasonable under section 549(A)(5) and OP-120230, thus negating any inference that they knew they were requesting money for an illegal purpose or that they had the intent to cheat or defraud anyone by making such a request. The act of making such a request simply does not provide "some evidence" to support a conviction for violating section 1541.1

**E. Intent to cheat and defraud.** Citing *Hill,* 472 U.S. at 455-56, respondent makes the novel argument that, because our review is limited to determining only whether "some evidence" supports the disciplinary conviction, mens rea (even if an element necessary to establish a violation of § 1541.1) is irrelevant. We disagree. In *Hill*, the Supreme Court held that, "[r]evocation of good time credits is not comparable to a criminal conviction, and neither the

-22-

amount of evidence necessary to support such a conviction, nor any other standard greater than some evidence applies in this context." 472 U.S. at 456 (citation omitted). But the Court further held that, to satisfy due process, there must be "some evidence to support the findings made in the disciplinary hearing." *Id.* at 457. The Court's holding is directed toward the qualitative and quantitative character of evidence necessary to support a disciplinary conviction; it rejects the "clear and convincing" or "beyond a reasonable doubt" standards. But the Court did not imply that there need not be "some evidence" for each element necessary to establish a violation of the particular criminal statute used as the basis of a disciplinary conviction.

Alternatively, respondent argues that the inmates' mens reas are supported by some evidence because Mr. Smith's 1999 memo "informed the inmate population that 'only court ordered filing fees may be paid from mandatory savings.'" Aplee. Br. No. 03-6057, at 10; Aplee. Br. No. 03-6150, at 13. Mr. Smith's interpretation of section 549(A)(5) and OP-120230, however, is not necessarily correct and is certainly not the only reasonable interpretation. The statutory language, legislative history, and case precedent discussed above justify an interpretation of section 549(A)(5) that would allow use of petitioners' mandatory savings accounts consistent with their requests to withdraw funds. As a consequence, those requests are not evidence supporting a finding that

-23-

petitioners intended to "cheat and defraud." Because no other evidence was presented, there was a complete failure of proof.

## V. Conclusion

We hold that no evidence supports a finding that either Mr. Gamble or Mr. Popejoy violated section 1541.1. Accordingly, no findings or evidence support a conclusion that either inmate committed a class X misconduct that could be sanctioned or disciplined. The misconduct convictions must be reversed and expunged from the inmates' records, and all earned credits revoked as a result of the convictions, and their former status in earning credits, must be restored.

The judgment of the district court is REVERSED and this matter is REMANDED for issuance of the writ.

03-6057 and 03-6150  , *Gamble v. Calbone; Popejoy v. Ward*

**HENRY**, Circuit Judge, concurring.

I fully concur in the majority opinion:  Great Plains Correctional Facility has failed to provide *any* evidence that Mr. Gamble or Mr. Popejoy acted with the requisite "intent to cheat and defraud."  OKLA. STAT. tit. 21, § 1541.1.  Mr. Gamble and Mr. Popejoy seem to have quite honestly, and I suggest, *reasonably*, believed that their disbursement requests were permissible under OKLA. STAT. tit. 57, § 549(A)(5).  As the panel acknowledges, "the inmates' understanding that requesting disbursement from their mandatory savings for the costs of obtaining their transcripts was a legal request is justified under Oklahoma case precedent and legislative history."  Maj. Op. at 18; *see also* OKLA. STAT. tit. 28, § 31 (listing the charge for "[m]aking [a] copy of an instrument of record or on file" as an example of a "fee" to be collected by the district court); *Cumbey v. State*, 699 P.2d 1094, 1096 (Okla. 1985) (denying inmates' request to proceed IFP and directing "the Department of Corrections to release the sum of fifty ($50) dollars for the costs of filing this appeal; and the sum of thirty ($30) dollars . . . for *costs of assembling the record on appeal*") (emphasis added).  After all, paying court costs is a good thing, as is reinforcing the reality that one must, by and large, pay one's own way.

The lack of intent to cheat and defraud is further highlighted by the fact that prison officials could simply have rejected the inmates' requests for

disbursements to cover copying and transcript fees. Oklahoma Department of Corrections policy states that "[t]he appropriate staff will approve or disapprove the disbursement request and forward to [the] trust fund officer, or return to [the] inmate if not approved." OP-120230(VII)(B)(1). The panel notes that "submitting a disapproved disbursement request is not an act that constitutes a rule violation under OP-060125." Maj. Op. at 13. I question why the staff did not simply reject the inmates' disbursement requests rather than charging them with obtaining money under false pretenses.

Finally, I believe that the Great Plains Correctional Facility's interpretation of the statute is simply wrong. I fail to see the harm in allowing prisoners to spend their funds on court costs and fees, whether they are associated with the filing of a case or the prosecution of it. It would make little sense to allow savings account monies to be used to file a case and then forbid their use to provide courts with materials useful in resolving that case. Indeed, it is possible that interpretations this far off the mark could raise constitutional implications concerning access to the courts. But as Mr. Gamble and Mr. Popejoy did not adequately raise the constitutionality of this interpretation, and keeping in mind that "[i]t is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case," *Burton v. United States*,

196 U.S. 283, 295 (1905), I rest my decision with the majority on the clear lack of evidence of intent in these two cases.