**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LARRY WILSON,

      Petitioner-Appellant,

v.

JUSTIN JONES, Director of the
Oklahoma Department of
Corrections; ATTORNEY
GENERAL OF THE STATE OF
OKLAHOMA,

      Respondents-Appellees.[*]

No. 02-6384

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-02-0301-F)**

---

Vicki Mandell-King, Assistant Federal Public Defender (Raymond P. Moore,
Federal Public Defender, and Howard A. Pincus, Assistant Federal Public
Defender, on the briefs), for Petitioner-Appellant.

Larry Wilson filed a brief *pro se.*

---

[*] Pursuant to FED.R.APP.P. 43(c)(2), Justin Jones, Ron Ward's successor at
the Oklahoma Department of Corrections, has been automatically substituted as a
party in this appeal.

Keeley L. Harris, Assistant Attorney General (W. A. Drew Edmondson, Attorney General of Oklahoma, and Kellye Bates, Assistant Attorney General, with her on the briefs), for Respondents-Appellees.

---

Before **HENRY**, **HOLLOWAY**, and **LUCERO**, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

Larry Wilson, an Oklahoma State inmate incarcerated at the Great Plains Correctional Facility, appeals the district court's denial of his petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2241. Mr. Wilson alleges that his due process rights were violated when a Class X misconduct conviction caused him to be demoted from a credit-earning prisoner to a non-credit-earning prisoner because no evidence supported the misconduct conviction. We agree with Mr. Wilson, and reverse and remand for issuance of the writ.

## I. BACKGROUND

Mr. Wilson's problem began with what seems an innocuous or even laudable action: he attempted to use his mandatory savings account to pay for the costs associated with copying the court documents he needed to pursue a post-conviction proceeding. Because of that attempt, he was charged with violating Oklahoma law, subjected to prison disciplinary proceedings, and convicted of a

2

Class X misconduct. The Class X misconduct conviction triggered two automatic and mandatory consequences. First, Mr. Wilson was demoted from a class-level-four prisoner, earning 44 credits each month toward early release, to a class-level-one prisoner, ineligible to earn any credits. Second, the Class X misconduct made him ineligible for promotion beyond level two, where he could earn only 22 credits each month, for a period of two years. To understand fully the misconduct conviction and its effects on Mr. Wilson, first we examine the Oklahoma law he was accused of violating, the details of the misconduct conviction and its consequences, and how those consequences led to Mr. Wilson's petition in this court.

## A.    Oklahoma Law Regarding Use of Mandatory Savings Accounts

Prisoners in Oklahoma are required to keep a mandatory savings account, in which they must deposit twenty percent of the wages they earn from prison employment. They may only access the account to pay "fees or costs in filing a civil or criminal action as defined in Section 151 *et seq*. of Title 28 of the Oklahoma Statutes." OKLA. STAT. tit. 57, § 549(A)(5) (2004). Section 151(A), in turn, provides that district court clerks shall "charge and collect the fees imposed by this title, [and] fines, costs and assessments imposed by the district court or appellant courts." OKLA. STAT. tit. 28, § 151(A) (2004). Our court has recently concluded that Oklahoma inmates can use mandatory savings accounts to pay any

3

fee, fine, cost or assessment imposed by any section of Title 28 of the Oklahoma Statutes. Included under Title 28 and payable by a mandatory savings account are "photocopy charges imposed by a court clerk for obtaining official records and transcripts." *Gamble v. Calbone*, 375 F.3d 1021, 1029 (10th Cir. 2004) (citing OKLA. STAT. tit. 28, § 31).

Despite the broad sweep of section 151(A) and the inclusion of copying costs in Title 28, when Mr. Wilson followed the usual procedures and requested, in writing from the proper prison authorities, the release of $170 from his mandatory savings account to pay for copies of proceedings in his criminal conviction for use in his post-conviction appeal, the private prison officials charged him with a Class X misconduct. Any violation of city, state, or federal law constitutes a Class X misconduct, "the most serious class of prison misconduct." *Gamble*, 375 F.3d at 1025 n.4; Okla. Dep't of Corr. (DOC) Policy OP-060125, Attachment A. Here, prison officials accused Mr. Wilson of violating Okla. Stat. tit. 21, § 1541.1, which prohibits obtaining money under false pretenses. The only evidence for the charge was the written form Mr. Wilson had submitted to prison officials. On the form, he requested payment from his account "to attain transcripts and court documents from Murray County Court Clerk." Rec. vol. I, doc. 2, Ex. B (Request to Staff, Oct. 9, 2001).

4

**B.      Misconduct Conviction and its Consequences**

After a hearing, prison officials determined that Mr. Wilson had violated section 1541.1 and punished him by (1) revoking 180 of his earned credits and (2) imposing thirty days' disciplinary segregation. For reasons unclear on this record, Mr. Wilson's punishments were immediately suspended for 90 days. The State represented in its supplemental brief that, because the 90 days expired without incident, "the 180 credits can never be revoked." Aples' Supl. Br. at 3 (Mar. 14, 2005).

Pursuant to DOC policy, any Class X misconduct conviction triggers certain "*[m]andatory* sanctions [that] cannot be suspended." Okla. DOC Policy OP-060125(IV)(E) (emphasis added). Here, the Class X misconduct conviction resulted in Mr. Wilson's mandatory reclassification from a class-level-four prisoner to a class-level-one prisoner, as required by the Oklahoma DOC's prisoner classification procedures. Okla. DOC Policy OP-060107(I)(C)(2)(a)(5) (stating that "[l]evel I assignment is mandatory . . . [u]pon conviction for any misconduct, effective the date of the misconduct"). While a class-level-four prisoner, Mr. Wilson automatically earned 44 credits per month toward early release, but as a class-level-one prisoner, Mr. Wilson was statutorily ineligible to earn any credits. OKLA. STAT. tit. 57, § 138(D)(2).

Mr. Wilson was required to spend thirty days at level one. Okla. DOC

5

Policy OP-060107(I)(C)(6). After that time, Mr. Wilson was promoted to level two, where he remained for one year until he received another misconduct conviction. Rec. vol. 1, doc. 10, Ex. A (Aples' Resp. to Pet., filed May 7, 2002); Aples' Supl. Br., Ex. D.

Prisoners are automatically assigned to level two upon reception into the prison system. Okla. DOC Policy OP-060107(I)(C)(2)(b). Ordinarily, an adjustment review committee of at least three prison officials reviews an inmate's classification at least once every four months to determine whether a change in classification is necessary because a prisoner has met (or failed to meet) certain statutory criteria. OKLA. STAT. tit. 57, § 138(F). The statutory classification system provides for classification between levels one and four depending on the factors listed in the statute, some of which are objective, such as the length of incarceration, and some of which require an exercise of prison officials' subjective judgment and discretion, such as whether a prisoner's hygiene has been "outstanding" or merely "good." *See id.* § 138(D)(3)&(4). Once a prisoner is classified at a particular level, the prisoner is statutorily entitled to earn a specified number of credits. *Id.* Regardless of whether Mr. Wilson continued to meet the statutory criteria for promotion to levels three or four, the Class X conviction caused Mr. Wilson to become ineligible for promotion beyond class level two for a period of two years. Okla. DOC Policy OP-060107(I)(C)(2)(c) &

6

(d); Okla. DOC Policy OP-060103(a)(M).

## C.      Procedural History

As a result of the misconduct conviction and its automatic, mandatory consequences, Mr. Wilson filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2241 to challenge the misconduct conviction.  He contends that the misconduct conviction violated his due process rights because it was unsupported by evidence.  The magistrate judge recommended that Mr. Wilson's petition be denied because (1) Mr. Wilson never actually lost any earned credits, and (2) the demotion in class level did not implicate a constitutionally protected "liberty interest sufficient to invoke the procedural protections of the due process clause." Rec. vol. I, doc. 12, at 4 (Rep. & Rec., filed May 7, 2002).  The district court adopted the magistrate judge's recommendation without further opinion.  Mr. Wilson then filed an application for a certificate of appealability (COA).  *See* 28 U.S.C. § 2253.  In 2003, we granted Mr. Wilson's application for a COA on three issues: (1) whether Mr. Wilson properly exhausted his state-court remedies; (2) whether his reclassification deprived him of a constitutionally protected liberty interest; and (3) if so, whether the reclassification violated his due process rights because there was insufficient evidence to prove his alleged misconduct.

Subsequent to the district court's decision, this court, in *Gamble v. Calbone*, granted habeas relief to two prisoners from the same prison as Mr.

7

Wilson, who had also been convicted of the same Class X misconduct based on the same "evidence" as Mr. Wilson. 375 F.3d 1021 (10th Cir. 2004). We ordered that the State provide additional briefing in light of *Gamble* on the issue of whether Mr. Wilson's suspended punishment could ever be reinstated. After receipt of the supplemental brief, we ordered oral argument and the appointment of a federal public defender to represent Mr. Wilson.

.

## II. DISCUSSION

The Fourteenth Amendment prohibits states from depriving citizens of liberty without due process of law. Although their due process rights are defined more narrowly, that guarantee applies to prisoners as well. Thus, in *Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995), the Supreme Court concluded that a prisoner is entitled to due process before he is subjected to conditions that "impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," or disciplinary actions that "inevitably affect the duration of his sentence. *See also Talley v. Hesse*, 91 F.3d 1411, 1414 (10th Cir. 1996) (discussing these two ways of establishing a liberty interest under *Sandin*).

As a general rule, before officials may take actions that affect these protected liberty interests, they must afford a prisoner (a) advance written notice

8

of the charges; (b) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (c) a written statement by the factfinder of the evidence relied upon on and the reasons for the disciplinary action. *Superintendent, Mass. Corr. Inst. at Walpole v. Hill*, 472 U.S. 445, 454 (1985). In addition, the decision must be supported by some evidence. *Id.*

In this appeal, Mr. Wilson contends that: (a) requiring state-court exhaustion in this type of habeas appeal is futile; (b) his Class X misconduct conviction inevitably affected the length of his sentence and thus infringed a liberty interest; and (c) no evidence supported that conviction. As a result, he concludes, prison officials violated his due process rights. Each of these issues involves questions of law, and our review is thus de novo. *See Gamble*, 375 F.3d at 1027 (sufficiency of the evidence); *Miller v. Menghini*, 213 F.3d 1244, 1246 (10th Cir. 2000) (exhaustion); *Harper v. Young*, 64 F.3d 563, 566 (10th Cir. 1995) (existence of a liberty interest). For the reasons set forth below, we are persuaded by Mr. Wilson's arguments as to all three issues.

## A. Exhaustion of Remedies

A habeas petitioner seeking relief under 28 U.S.C. § 2241 is generally required to exhaust state remedies. *Montez v. McKinna*, 208 F.3d 862, 865 (10th

9

Cir. 2000). However, that requirement is not applicable when the prisoner has no adequate remedy such that exhaustion would be futile. *Gamble*, 375 F.3d at 1026.

In *Gamble*, we explained that a prisoner "seeking speedier . . . release due to alleged errors in calculating earned or good-time credits does not have an adequate habeas remedy under Oklahoma law, and that requiring state exhaustion would be futile." *Id.* at 1026 (citing *Wallace v. Cody*, 951 F.2d 1170, 1172 (10th Cir. 1991)). Moreover, prisoners in Oklahoma cannot file a direct judicial appeal to the state courts challenging a disciplinary board decision regarding their earned-credit status. *Id.* (citing *Canady v. Reynolds*, 880 P.2d 391, 396-97 & n.4 (Okla. Crim. App. 1994)). As a result, we concluded that the prisoners there were not required to seek relief in state court, and we therefore proceeded to the merits of their due process claims.

Here, the State conceded during oral argument that Mr. Wilson has exhausted his administrative remedies, and in its briefs, argued only that Mr. Wilson had not exhausted his state-court remedies. Because of our holding in *Gamble* that requiring state exhaustion is "futile," Mr. Wilson has satisfied all exhaustion requirements associated with this type of habeas claim and his petition is properly before this court. Therefore, we proceed to the merits of his due process claim.

## B. Liberty Interest

Invoking *Sandin*, Mr. Wilson argues that his Class X misconduct conviction "inevitably affect[ed] the duration of [his] sentence," 515 U.S. at 487, and thus implicated a liberty interest. He reasons that the conviction mandatorily reduced the rate at which he earned good time credits, and argues that this impact was sufficient for this court to grant relief in *Gamble*. In response, the State contends that despite Mr. Wilson's improper Class X misconduct conviction, prison officials retained discretion to change his classification—and the resulting rate at which he would earn good time credits. According to the State, that discretion demonstrates that the effect of the Class X misconduct conviction was not inevitable and that, as a result, no liberty interest was implicated. Resolution of this issue requires an examination of *Sandin*, subsequent decisions applying it, and other Tenth Circuit due process cases.

### 1. Sandin

*Sandin* involved an inmate from Hawaii's state prison who alleged that two misconduct convictions violated his due process rights. 515 U.S. at 475-76. He was convicted of one "high misconduct" and one "low moderate misconduct," and the high misconduct charge was later reversed and expunged from his record. *Id.* at 475-76, 487 n.10. The Court noted that the Hawaii parole board was not

*required* to deny parole as a result of the misconduct charges: "even though misconduct is by regulation a relevant consideration, . . . [t]he decision to release a prisoner rests on a myriad of considerations." *Id.* at 487. Therefore, the Court reasoned, the misconduct conviction did not inevitably affect the duration of the prisoner's sentence: "[t]he chance that a finding of misconduct will alter the balance is simply too attenuated to invoke the procedural guarantees of the Due Process Clause." *Id.* The Court implied that if the parole board had been required to take particular actions as a result of the misconduct charge, its decision might have been different: "we note that Hawaii expunged [the inmate's] record with respect to the 'high misconduct' charge, so he personally has no chance of receiving a delayed release as a direct result of that allegation." *Id.* at 487 n.10.

As the Fifth Circuit has noted, "a host of administrative or disciplinary decisions made by prison authorities might somehow affect the timing of a prisoner's release." *See Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995). However, many of these decisions do not trigger the protections of the due process clause. For example, applying *Sandin,* a number of courts have concluded that a decision that a particular prisoner is ineligible to participate in certain programs does not implicate a protected liberty interest, even though participation in those programs would have provided him with an opportunity to

12

earn good time credits at a higher rate. In these courts' view, the effect of the challenged decisions on the length of the prisoner's sentence is "too attenuated" to implicate a liberty interest. *See, e.g*, *Zimmerman v. Tribble*, 226 F.3d 568, 571-72 (7th Cir. 2000) (holding that a prisoner's transfer to a facility that did not offer vocational training and substance abuse programs did not implicate a liberty interest, even though the transfer resulting in the loss of an opportunity to earn good time credits); *Higgason v. Farley*, 83 F.3d 807, 809-10 (7th Cir. 1996) (holding that a prisoner's placement in segregation, which resulted in the loss of access to educational programs and the resulting opportunity to earn good time credits did not implicate liberty interest, reasoning that "even if [the prisoner"] has been given the opportunity, it was not inevitable that he would complete an educational program and earn good time credits"); *Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir. 1995) (holding that the loss of a prison job did not implicate a prisoner's liberty interest even though the prisoner lost the ability to automatically accrue good-time credits).

## 2. Tenth Circuit Decisions

This circuit has indicated that the connection between a disciplinary decision and the length of a prisoner's sentence may be sufficient to establish a liberty interest when the prisoner establishes that the decision was the only factor

13

that lengthened the sentence. *See Reed v. McKune*, 298 F.3d 946, 954 (10th Cir. 2002) (noting that, under *Sandin*, "deprivations of process impacting on parole decisions may be 'too attenuated to invoke the procedural guarantees of the Due Process Clause,'" but that "[petitioner's] claim that he is being denied parole *solely* on the basis of his failure to participate in [a treatment program] is not so attenuated" and that, as a result, the petitioner "might, therefore, potentially state a due process violation") (quoting *Sandin,* 515 U.S. at 487) (emphasis added).

We have also held that there are circumstances in which the reduction of the rate at which a prisoner earns good time credits may trigger due process protections. For example, in *Chambers v. Colorado Dep't of Corrections*, 205 F.3d 1237, 1242 (10th. Cir. 2000), Colorado prison officials classified the petitioner as a sex offender for five years but then reduced the rate at which he earned good time credits after he refused to participate in a treatment program. We concluded that "[prison officials] provided [the petitioner] [with] a liberty interest in the consequences of the mandatory label which they then arbitrarily removed without affording him any opportunity to a hearing to challenge the label." *Id*. at 1243 (emphasis deleted). We characterized "the consequences of the [sex offender] label," (i e., the opportunity to earn good time credits at a higher rate) as "a benefit that cannot be taken away without some process." *Id*.

In *Gamble* we found due process protections implicated in circumstances

14

closely resembling the facts here. The petitioners, both inmates from the Great Plains Correctional Facility, had attempted to use their mandatory savings accounts to pay for costs associated with the appeals of their criminal convictions. *Gamble*, 375 F.3d at 1032. Like Mr. Wilson, the petitioners had been convicted of a Class X law violation, "[o]btaining money under false pretenses," and the only evidence against each of them was a copy of the inmates' check requests. *See id.* at 1024-25. Unlike Mr. Wilson, neither of the *Gamble* inmates' punishments was suspended and both inmates lost earned credits as a result of the misconduct conviction. However, one of the petitioners had additionally complained that the misconduct conviction resulted in his demotion from level four to level one. *Id.* at 1025.

We concluded that the Class X violation was supported by no evidence and that, as a result, the petitioners' due process rights had been violated. *See id.* at 1031-32. Significantly, as a remedy for this due process violation, we directed prison officials to reverse the misconduct convictions, expunge the convictions from the petitioners' records, restore all earned credits that had been revoked, *and* restore "their former statuses in earning credits." *Id.* at 1032.

In *Gamble*, we did not discuss whether the revocation of earned credits or the reduction in credit-earning status (from level four to level one) implicated the petitioners' liberty interests. "It is well settled" that an inmate must be afforded

15

due process prior to the revocation of his earned credits. *Mitchell v. Maynard*, 80 F.3d 1433, 1444 (10th Cir. 1996). Mr. Wilson contends that, because we additionally restored the prisoners' pre-misconduct classification statuses in *Gamble*, we implicitly held that a prisoner's mandatory classification demotion constitutes a liberty deprivation. Although we disagree with Mr. Wilson's characterization of our holding in *Gamble*, we believe that the remedy we granted does assist our analysis of Mr. Wilson's claim under *Sandin*. Given that the *Gamble* prisoners filed a § 2241 habeas petition, our restoration of credit-earning status suggests that a demotion resulting from a misconduct conviction has a direct, unattenuated impact on the duration of a prisoner's confinement. *See* 28 U.S.C. § 2241(c)(3) ("The writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States"); *see also McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 812 (10th Cir. 1997) (explaining that a habeas petition under § 2241 may be granted only if the challenged state action "affect[ed] the . . . duration of the petitioner's custody").

### 3. Mr. Wilson's Misconduct Conviction

Upon review of Mr. Wilson's Class X misconduct conviction, we now expressly adopt the conclusion that *Gamble* suggests and *Sandin* requires: the

16

misconduct conviction infringed a liberty interest because it reduced his credit earning class in a manner that "inevitably affect[ed] the duration of his sentence. *Sandin,* 515 U.S. at 487. As we have noted, as a direct result of the Class X misconduct conviction, Mr. Wilson was automatically demoted from a level-four credit earning classification to level one. Moreover, Oklahoma DOC policy prohibited Mr. Wilson from being considered for promotion beyond level two for a period of two years. Prison officials exercised absolutely no discretion over the imposition of these two punishments and had no discretion to allow Mr. Wilson to avoid them. Okla. DOC Policies OP-060107(I)(C)(2)(a)(5); OP-060107(I)(C)(2)(c) & (d); OP-060103(a)(M). Thus, Mr. Wilson lost more than a mere opportunity to earn credits upon satisfactory completion of a job or program in the future. *See Zimmerman v. Tribble*, 226 F.3d at 571-72; *Higgason*, 83 F.3d at 809-10; *Bulger*, 65 F.3d at 50.

That lack of discretion contrasts markedly with the discretionary effect on the prisoner's chances of parole in *Sandin*, where the disciplinary infraction was only one of "a myriad of considerations," 515 U.S. at 487, that could affect whether the prisoner received an early release. In Mr. Wilson's case, the only consideration in his demotion and prevention from promotion was the misconduct conviction. These effects were not the result of prison officials' discretion after they considered a number of factors; rather they occurred solely, automatically,

17

and mandatorily because of the misconduct conviction.  This "but for" causation is the kind of "direct result" that *Sandin* requires for a disciplinary action to have an inevitable effect on a sentence.  *See* 515 U.S. at 487 n.10.

We find additional support for this conclusion in the Seventh Circuit's opinion in *Montgomery v. Anderson*, 262 F.3d 641 (7th Cir. 2001).  There, the Seventh Circuit held that Indiana prisoners are deprived of liberty when demoted to a lower credit-earning status.  The court cited Supreme Court decisions holding that prisoners may have a liberty interest in the expectation of parole where the parole boards' discretion is limited by mandatory language in a statute or a regulation.  Writing for the panel, Judge Easterbrook analogized the opportunity to earn credits toward early release to those parole cases, noting that "[a] hope to be released before the expiration of one's term on good-time credits is no different in principle from a hope to be released on parole." *Id.* at 645.  Judge Easterbrook examined the statute at issue and noted that it required prisoners to be assigned to a credit-earning class unless certain events occurred, thus "curtail[ing] administrators' discretion and . . . giv[ing] prisoners more than a subjective hope of receiving day-for-day credit." *Id*.  The impact of a demotion in class level on the prisoner's sentence was directly traceable and clearly evident: but for the demotion, the prisoner would have continued to earn credits. *See id.* Thus, the Indiana statute created a liberty interest.

18

### 4. The State's Arguments

In maintaining that Mr. Wilson's conviction did not implicate a liberty interest, the State advances several arguments. We find none of them persuasive.

First, the State notes that prison officials have discretion to change an inmate's classification status. It contends that prison officials could have used that discretion to change Mr. Wilson's classification at any time and that, as a result, the misconduct conviction did not inevitably affect his sentence. In our view, the State ignores the fact that Mr. Wilson's conviction resulted in a *mandatory* change in credit-earning status. In light of that mandatory effect, the fact that prison officials have discretion to change a prisoner's classification *when considering other conduct* is irrelevant. As Judge Easterbrook observed in *Montgomery,* states have been held to create liberty interests in the expectation of early release even where the statute at issue "afforded plenty of discretion" to prison administrators. *Id*.; s*ee also Bd. of Pardons v. Allen*, 482 U.S. 369, 375-76 (1987) (explaining that an official "has discretion if his duty is defined by standards that reasonable [people] can interpret in different ways" and that "the presence of official discretion in this sense is not incompatible with the existence of a liberty interest in parole release when release is *required* after the Board determines (in its broad discretion) that the necessary prerequisites exist")

19

(quotation marks omitted) (alteration in original).

The State also directs us to a number of unpublished cases in this circuit that are somewhat similar to Mr. Wilson's case, although all but one pre-date *Gamble*. Those cases generally hold that a demotion in classification status does not necessarily implicate a liberty interest. Although we are not bound by these unpublished orders, we believe that they are distinguishable from the present case.

In *Hudson v. Ward*, the one post-*Gamble* case that the State cites, the classification demotion did not occur mandatorily as a result of a misconduct conviction but rather resulted from an ordinary exercise of prison officials' discretion. 124 F.App'x 599, 601-02 (10th Cir. Feb. 14, 2005) (unpublished); *see also Smith v. Okla. Dep't of Corr.*, 98 F.3d 1350 (10th Cir. Oct. 8, 1996) (unpublished) (holding that a loss of job for unsatisfactory performance, which resulted in a demotion in credit-earning status, does not implicate a liberty interest); *Brown v. Champion*, 61 F.3d 915 (10th Cir. July 24, 1995) (unpublished) (stating that the reclassification that resulted from a misconduct conviction was "entirely discretionary with prison officials"). *Davis v. Ward* presents a situation that is much like Mr. Wilson's case, but *Davis* was a pre-*Gamble* decision that could not take into account the published opinion's decision to restore prisoners' former credit-earning statuses, nor did it consider the

mandatory character of the prison regulation that removes discretion from prison officials.[1]  92 F.App'x 634, 635-36 (10th Cir. Feb. 9, 2004) (unpublished).

Finally, the State urges us to follow *Templeman v. Gunter*, 16 F.3d 367 (10th Cir. 1994), a published case that the magistrate judge cited in her recommendation that Mr. Wilson did not suffer a liberty deprivation. *Templeman* analyzed Colorado law and held that when a prisoner was transferred to administrative segregation, he was not deprived of a liberty interest because the regulation governing such a transfer stated that transfer was within "the sound exercise of discretion by the classification officer." *Id.* at 369.  The prison regulation listed a few factors officials should consider prior to transfer, but specified that "the list is not exhaustive and includes any other reasons of similar magnitude deemed sufficient." *Id.* (citation and quotation omitted).  Again, because prison officials had the discretion to reclassify the prisoner into administrative segregation, and "[o]nce there, Templeman did not meet the criteria for receiving earned time," the prisoner was not deprived of a liberty interest. *Id.* at 370.

---

[1]  Another unpublished decision not cited by the State implied that *Gamble*'s remedy should impact an analysis of whether a reclassification that results from an improper misconduct conviction deprives a prisoner of a liberty interest. *See Cook v. Ward*, 122 F.App'x. 935, 937 n.5 (10th Cir. Dec. 14, 2004) (unpublished) (instructing prisoner to seek "administrative relief with respect to retroactive reinstatement of level 4 credits" and noting that "in *Gamble* . . . this court awarded a full restoration of benefits upon a finding of the denial of due process and no evidence to support misconduct convictions").

*Templeman* is significantly different from the instant case in several respects. First, *Templeman* analyzed an entirely different set of regulations than those that Oklahoma prison officials use. Second, unlike in Colorado, where officials had nearly unbridled discretion to transfer the prisoner, Oklahoma's prison officials must follow statutory and regulatory criteria when deciding whether to reclassify a prisoner. Finally, this court in *Templeman* relied upon the fact that the Colorado officials "reasonably concluded that inmates in administrative segregation do not meet . . . the criteria for receiving earned time." *Id.* Certainly prison officials' exercises of discretion should generally be respected, as "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin*, 515 U.S. at 482. Nonetheless, as we have repeatedly stressed, Mr. Wilson's reclassification did not occur because of an exercise of discretion, but rather was an automatic and mandatory sanction resulting from an erroneous misconduct conviction.

Accordingly, following *Sandin*, and for the reasons reviewed above, we hold that the Class X misconduct inevitably affected the duration of Mr. Wilson's sentence and therefore deprived him of a liberty interest. Because of this deprivation, we now examine whether the underlying misconduct conviction comported with due process

22

## C. Misconduct Conviction

The Supreme Court has instructed that, when reviewing a prison disciplinary proceeding, courts should determine whether "any evidence in the record . . . could support the conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56. We applied this deferential standard of review in *Gamble* and held that no evidence supported the petitioners' misconduct convictions. After examining section 1541.1, we concluded that, in order to affirm the misconduct conviction for obtaining money by false pretenses under the "any evidence" standard, "there must be evidence that the inmates attempted to obtain money by means of a trick, deception, or false representation. It is necessary that they *knew* it was a trick, deception, or false representation, and that they had the intent to cheat and defraud." *Gamble*, 375 F.3d at 1028.

The State has agreed that the decision in *Gamble* controls here and has acknowledged that no evidence exists to support Mr. Wilson's conviction. We appreciate this concession and hope that, in light of *Gamble* and the instant matter, the Oklahoma DOC will carefully oversee disciplinary proceedings and review its policies for ambiguities and contradictions so that such clearly problematic disciplinary actions are cured in an administrative setting, as they should be. As we noted in *Gamble*, "[t]he inmates' understanding that requesting disbursement from their mandatory savings for the costs of obtaining their

23

transcripts was a legal request is justified under Oklahoma case precedent and legislative history." *Id.* at 1030.

The Oklahoma DOC policy in effect in 2001 regarding the use of a mandatory savings account was contradictory and confusing, especially in light of the state legislature's specific allowance for this one class of expenditures from mandatory savings accounts.[2]  Indeed, amendments that the state legislature made in 1995, permitting inmates to use mandatory savings accounts for costs associated with criminal cases and requiring courts to consider the availability of a mandatory savings account prior to granting in forma pauperis, "'compel[] a prisoner to weigh the validity of a lawsuit against the cost of pursuing it.'" *Id.* at 1031 (quoting *Smith v. Moore*, 50 P.3d 215, 218 n.4 (Okla. 2002)).  The legislature's policy makes good sense: it alleviates public subsidization of court costs and deters prisoners from filing frivolous lawsuits, as they must use the small amount of savings they would have upon release from prison to pay for costs associated with their appeals. *See id*.  Furthermore, "[i]t would make little sense to allow savings account monies to be used to file a case and then forbid their use to provide courts with materials useful in resolving that case." *Id.* at

---

[2]  The policy stated correctly that "allowable fees are defined in O.S. 28, Section 151 *et seq*" but later, narrowed the range of allowable fees by calling them simply "filing fees," implying that filing fees were the only acceptable costs that could be paid from a mandatory savings account.  Okla. DOC Policy OP-120230.

24

1033 (Henry, J., concurring).

Due process in a prison setting is very limited, but some safeguards remain to ensure that the few rights prisoners do retain are not violated by prison officials' arbitrary exercise of their power. *See Wolff v. McDonnell*, 418 U.S. 539 (1974) (explaining that limited due process rights apply in a prison disciplinary setting because "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application"). Among these safeguards is the requirement that disciplinary convictions that mandatorily affect time served be supported by *some* evidence, which is a minimal but nonetheless important standard.

### III.  CONCLUSION

We hold that the State's action here deprived Mr. Wilson of a liberty interest because the mandatory and automatic consequences of the Class X misconduct conviction inevitably affected the duration of his sentence. Therefore, Mr. Wilson's due process rights were violated when he was convicted of misconduct without any evidence. The misconduct conviction must be reversed and expunged from his record, and his former status in earning credits must be restored.

The judgement of the district court is REVERSED and this matter is

25

REMANDED for issuance of the writ.