[No. 80834-1. En Banc.]
Argued October 30, 2008.     Decided October 8, 2009.

*In the Matter of the Personal Restraint of* JAY ROBERT PULLMAN, JR., *Petitioner.*

*David L. Donnan* and *Maureen M. Cyr* (of *Washington Appellate Project*), for petitioner.

*Robert M. McKenna, Attorney General, Jay D. Geck, Deputy Solicitor General, Paul D. Weisser, Senior Counsel,* and *Ronda D. Larson, Assistant*, for respondent.

¶1 MADSEN, J. — Jay Pullman filed a personal restraint petition challenging the Department of Corrections (DOC)

determination that he is not eligible to earn early release credits at a 50 percent rate due to a change in Pullman's risk level. Pullman argues that he has a liberty interest in earning credits at the higher rate; he further contends DOC violated his due process rights when it did not give him notice and a hearing on his reclassification. Under the statutory scheme of "earned early release," Pullman has no liberty interest in earning credits at a 50 percent rate. Because Pullman has no liberty interest, he was guaranteed only that DOC would follow its procedures to reclassify him. Upon reclassification, an inmate is given the opportunity to appeal to the superintendent. Pullman was afforded all of these procedures. We deny Pullman's personal restraint petition.

## FACTS

¶2 Petitioner Jay Pullman is currently in the custody of DOC, serving two concurrent sentences for separate convictions under the Uniform Controlled Substances Act, chapter 69.50 RCW. Like all DOC offenders, Pullman was assessed for his risk of reoffense and potential for future harm within the first 30 days of his confinement. Supp'l Br. of Resp't DOC at 5, 7, App. 17 (DOC Policy 320.400,[1] at 2) (some offenders are initially assessed at the time of sentencing). Based on this assessment, Pullman was given a risk classification of RM-C (risk management). The risk classification system divides offenders into "one of four risk categories between highest and lowest." Former RCW 9.94A.728(1)(b)(iii) (2003 & 2004).[2] An offender's risk classification is determined on the basis of his score on the

---

[1] References to DOC policies are to the policies in effect at the times relevant to Pullman's claims unless otherwise noted.

[2] Former RCW 9.94A.728 (2003) applies to the DOC's actions before July 1, 2005. After that date, former RCW 9.94A.728 (2004) applies. The texts of the 2003 and 2004 versions are the same for our purposes (the only addition is an exclusion for offenders serving terms for serious crimes listed under RCW 9.94A.670(4)(a)). Former RCW 9.94A.728(2)(e) (2004). Therefore, all citations throughout this opinion refer to both the 2003 and 2004 versions of the statute.

Level of Service Inventory-Revised (LSI-R) and the Risk Management Identification Criteria (RMI). These two instruments assess an offender's risk of reoffense and potential for future harm and allow DOC to appropriately monitor offenders and provide for their rehabilitative needs.

¶3 Offenders classified in the two lowest categories, RM-C and RM-D, are statutorily eligible for a 50 percent reduction in their sentence so long as they do not have certain specified convictions. Former RCW 9.94A.728-(1)(b)(ii)(A). After the initial LSI-R assessment, reassessments are "event driven" and can occur (1) to correct inaccuracies, (2) if new or additional conviction or behavioral information is discovered, or (3) when an event occurs that demonstrates an increase in risk-related behaviors. Supp'l Br. of Resp't DOC, App. 17 (DOC Policy 320.400, at 2-3). An offender's reclassification generally occurs after reassessment of his LSI-R and RMI scores. See Supp'l Br. of Resp't DOC, App. 17 (DOC Policy 320.400, at 5). An offender who completes prison programs or improves conduct in accordance with DOC policies can be reclassified into a lower risk category. Conversely, an offender who refuses to participate in programs or commits infractions can be reclassified into a higher risk category. Reclassification from RM-C or RM-D to RM-B or RM-A results in an offender losing his eligibility to earn a 50 percent reduction in his sentence. See Supp'l Br. of Resp't DOC, App. 27 (DOC Policy 350.100, at 2). Offenders in the RM-A and RM-B categories appear eligible to earn a 33 percent reduction in their sentences unless other convictions or factors place them at a lower rate. See Supp'l Br. of Resp't DOC, App. 27 (DOC Policy 350.100).

¶4 Pullman's risk classification was twice reassessed in accordance with DOC policy. Pullman's second reassessment occurred after he committed four serious infractions, one resulting from multiple minor infractions, between April 21, 2005 and January 1, 2006.[3] After the second

---

[3] For each major infraction Pullman had advance notice and an opportunity to contest the allegations.

reassessment, Pullman was reclassified from RM-C to RM-B and was no longer eligible to earn a 50 percent reduction in his sentence. Pullman was informed of the change to his classification seven weeks after DOC altered his LSI-R score in light of his infractions. A classification counselor and corrections unit supervisor met with Pullman to explain the change and informed him he could appeal to the superintendent. The superintendent affirmed the change in Pullman's classification.

¶5 Pullman filed this personal restraint petition, pro se, in Division One of the Court of Appeals, claiming he was denied due process when his risk classification was changed without advance notice or an opportunity to be heard. The Court of Appeals denied Pullman's petition, and this court subsequently granted discretionary review and ordered counsel to be appointed for Pullman.

## ANALYSIS

■■ ¶6 Pullman challenges a DOC decision from which he has had "no previous or alternative avenue for obtaining state judicial review." *In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 149, 866 P.2d 8 (1994). To succeed in his petition Pullman must show that he is "under a 'restraint' " and that his restraint is unlawful. RAP 16.4(a). Pullman is clearly "under a restraint" by virtue of his incarceration. Pullman argues his restraint is unconstitutional and in violation of the laws of the State of Washington because DOC violated his right to due process when it raised his risk classification to a level at which he was unable to earn a 50 percent reduction in his sentence without advance notice or a hearing. Supp'l Br. of Pet'r at 19.

■ ¶7 The due process clause prohibits deprivation of life, liberty, or property without due process of law. U.S. CONST. amend. XIV, § 1. The threshold question in every due process challenge is whether the challenger has been de-

prived of a protected interest in life, liberty, or property.[4] *Cashaw*, 123 Wn.2d at 143.

¶8 " 'A liberty interest may arise from the Constitution, from guarantees implicit in the word liberty, or from an expectation or interest created by state laws or policies.' " *In re Pers. Restraint of Bush*, 164 Wn.2d 697, 702, 193 P.3d 103 (2008) (internal quotation marks omitted) (quoting *In re Pers. Restraint of McCarthy*, 161 Wn.2d 234, 240, 164 P.3d 1283 (2007)). "There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979); *Meachum v. Fano*, 427 U.S. 215, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976); *Cashaw*, 123 Wn.2d at 144. The constitution likewise "itself does not guarantee good-time credit for satisfactory behavior while in prison." *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). For a state law to create a liberty interest, "it must contain 'substantive predicates' to the exercise of discretion and 'specific directives to the decisionmaker that if the [law's] substantive predicates are present, a particular outcome must follow'." *Cashaw*, 123 Wn.2d at 144 (quoting *Ky. Dep't*

---

[4] By failing to argue Pullman has no liberty interest in his reclassification, and instead arguing DOC's decision to reclassify Pullman was "consistent with the due process requirements," the State apparently concedes that Pullman has a liberty interest at stake in his reclassification. Supp'l Br. of Resp't DOC at 15. However, there is explicit statutory language to the contrary: the legislature expressly declared that the change to former RCW 9.94A.728 allowing 50 percent reduction did "not create any expectation that the percentage of earned release time cannot be revised and offenders have no reason to conclude that the maximum percentage of earned release time is an entitlement or creates any liberty interest." RCW 9.94A.7281.

" '[I]t is well established that a party concession or admission concerning a question of law or the legal effect of a statute as opposed to a statement of fact is not binding on the court.' " *State v. Knighten*, 109 Wn.2d 896, 902, 748 P.2d 1118 (1988) (emphasis omitted) (quoting *Dettore v. Brighton Twp.*, 91 Mich. App. 526, 534, 284 N.W.2d 148 (1979), *vacated*, 408 Mich. 957, 294 N.W.2d 692 (1980)). Neither is a party's erroneous view of the law binding on this court. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 301, 840 P.2d 860 (1992). In addition, the State's "concession" in this case was equivocal at best. Because we disagree that Pullman had a liberty interest in his reclassification, we need not accept the State's erroneous concession of law.

*of Corr. v. Thompson*, 490 U.S. 454, 463, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989)).

▇ ¶9 "In *Greenholtz*, the Court held that the unique structure and language of a Nebraska parole statute, which mandated that the Board of Parole *shall* order an inmate's release *unless* it found one of four designated reasons for deferring parole, created a legitimate expectation of release. According to the Court, the mandatory language established a presumption that offenders would be released on parole and thus created a limited liberty interest." *McCarthy*, 161 Wn.2d at 241 (citation omitted) (citing *Greenholtz*, 442 U.S. at 11-12). In contrast to the legitimate substantive expectations created by statutes with mandatory language, procedural statutes that merely " 'structure the exercise of discretion' " can create only the expectation that an agency will follow its own procedures. *Cashaw*, 123 Wn.2d at 146 (quoting *Toussaint v. McCarthy*, 801 F.2d 1080, 1094 (9th Cir. 1986)).

▇ ¶10 Former RCW 9.94A.728 permits, but does not require, DOC to develop procedures by which an offender's sentence "may be reduced" "for good behavior and good performance." Former RCW 9.94A.728(1). In 2003, the legislature increased the maximum amount of time a qualified inmate could earn from one-third of the total sentence to one-half of the total sentence. LAWS OF 2003, ch. 379, § 1. The statute reads in relevant part:

> An offender is qualified to earn *up to* fifty percent of aggregate earned release time . . . if he or she:
>
> . . . [i]s classified in one of the two lowest risk categories under (b)(iii) of this subsection [and has not committed one of an enumerated list of crimes].
>
> . . . .
>
> . . . For purposes of determining an offender's *eligibility* . . . , the department shall perform a risk assessment [and] classify each assessed offender in one of four risk categories between highest and lowest risk.

Former RCW 9.94A.728(1)(b)(ii)(A), (iii) (emphasis added).

¶11 The legislature did not intend for this statute to create *any* expectation of a specific release date or a specific classification level:

The legislature declares that the changes to the maximum percentages of earned release time in chapter 379, Laws of 2003 do not create any expectation that the percentage of earned release time cannot be revised and *offenders have no reason to conclude that the maximum percentage of earned release time is an entitlement or creates any liberty interest.*

RCW 9.94A.7281 (emphasis added).

¶12 The statute is clear; offenders have no liberty interest in or entitlement to a 50 percent reduction in their sentence. DOC is given broad discretion to determine and enforce the procedures by which an offender will be allowed to earn a reduction in his sentence. Former RCW 9.94A.728(1) (a reduction in sentence "may" be granted "for good behavior and good performance" "in accordance with procedures that shall be developed and promulgated by the correctional agency having jurisdiction"). DOC is not *required* to grant a "fifty percent" sentence reduction; the legislature's 2003 amendment merely gives DOC *permission* to grant offenders "up to fifty percent" of their sentence in earned release time depending on the offender's risk level. Former RCW 9.94A.728(1)(b)(ii).

¶13 Pullman relies on *In re Personal Restraint of Adams*, 132 Wn. App. 640, 134 P.3d 1176 (2006), for the proposition that he has a protectable liberty interest in his risk classification. Supp'l Br. of Pet'r at 4-5. In *Adams*, Division One cited this court's decision in *In re Habeas Corpus of Monohan*, 84 Wn.2d 922, 530 P.2d 334 (1975), to hold that when DOC conducts an initial risk assessment and decides an inmate is eligible for a 50 percent reduction, "DOC must thereafter provide minimal due process to the inmate before changing his risk category to a level that allows him only to earn early release at a rate lower than 50 percent." *Adams*, 132 Wn. App. at 651 (citing *Monohan*, 84 Wn.2d at 923). The Court of Appeals' reliance on *Monohan* is misplaced.

¶14 Monohan had been granted parole "on his first offense and [had] his minimum sentence on the second offense [reduced] to the end that a tentative parole release date was established." *Monohan*, 84 Wn.2d at 923. While on furlough attempting to establish a parole plan, Monohan was arrested and charged with disorderly conduct. Without an opportunity to address the merits of his furlough infraction before the prison classification committee, the committee recommended that the parole board reconsider Monohan's pending parole. Pursuant to the unverified committee recommendation, the parole board cancelled Monohan's release date and extended his minimum term by nine months. *Id.* at 924.

¶15 The court analogized a furlough infraction to a violation of institutional rules and held Monohan deserved the process established in the parole statute. RCW 9.95-.080; *Monohan*, 84 Wn.2d at 926 n.2 (RCW 9.95.080 then provided, " '[R]evocation and redetermination shall not be had except upon a hearing before the board of prison terms and paroles.' "). Contrary to the statutory requirement, Monohan received no opportunity to contest allegations of misconduct. The *Monohan* court further noted that the system created under the parole statute appears to "assume that, given a satisfactory parole rehabilitation plan, the prisoner may justifiably rely upon the prefixed release date." *Monohan*, 84 Wn.2d at 928.

¶16 In contrast to the statutes in effect in *Monohan*, the system created by the legislature in former RCW 9.94A.728 assumes no such justifiable reliance. In fact, RCW 9.94A-.7281 explicitly warns that prisoners should not expect to earn the statutory maximum of 50 percent. Prisoners in Pullman's position are made aware that infractions can result in a reassessment of their risk classification. The policies of reassessment and reclassification make it clear that "an offender's risk level is always subject to change." Supp'l Br. of Resp't DOC at 5. Since former RCW 9.94A.728 explicitly precludes a prisoner from relying on its terms for an expected release date, our decision in *Monohan* is inapplicable.

▮ ¶17 It appears the court in *Adams* placed weight on the requirement in former RCW 9.94A.728(1)(b)(iv) that DOC "recalculate the earned release time and reschedule the expected release dates for each qualified offender under this subsection (1)(b)." *See Adams*, 132 Wn. App. at 651. The legislature's 2003 amendments made application of the "up to fifty percent" retroactive as of July 1, 2003. As a directive to DOC, the recalculation requirement in subsection (1)(b)(iv) is most reasonably read to ensure appropriate retroactive application of the new 50 percent reduction, not to create a new *substantive* requirement that DOC give offenders a "prefixed release date" on which it can "justifiably rely." *Monohan*, 84 Wn.2d at 928.

▮ ▮ ¶18 The *Adams* court was correct that "there is no protected liberty interest to earn the maximum percentage of early release time." 132 Wn. App. at 650 (citing *In re Pers. Restraint of Gronquist*, 138 Wn.2d 388, 397, 978 P.2d 1083 (1999); *In re Pers. Restraint of Dutcher*, 114 Wn. App. 755, 758, 760-61, 60 P.3d 635 (2002)). DOC's recalculation of an offender's potential early release date on the basis of a classification that is "always subject to change" cannot create a liberty interest where the legislature has made clear none exists.[5] To the extent *Adams* holds otherwise, it is overruled.

---

[5] Pullman argues that "DOC's initial determination" that Pullman was eligible for a 50 percent reduction "created a liberty interest that DOC could revoke only upon providing the required due process protections." Supp'l Br. of Pet'r at 9. However, Pullman would not have been justified in relying on this classification for a release date. Pullman was aware his initial classification was subject to change on the basis of his conduct during confinement.

Even if Pullman's classification had *not* changed, his knowledge of the 50 percent rate cannot alone establish a tentative release date. An offender's release date is calculated on the basis of many factors, including (1) the rate at which an offender earns credit, (2) amount of earned time lost as a result of infractions, (3) any change due to resentencing, (4) deductions for "out time" or "*Wickert*" time. *See generally* Supp'l Br. of Resp't DOC, App. 11 (showing Pullman's recalculation for "*Wickert*" time), App. 27 (DOC Policy 350.100 (describing different factors contributing to offender's final amount of earned release time)).

The statutory scheme in Washington is in sharp contrast to the process in Indiana, analyzed in *Montgomery v. Anderson*, 262 F.3d 641 (7th Cir. 2001). In that case the Seventh Circuit held, "Indiana must afford due process before reducing a prisoner's credit-earning class." *Id.* at 645. Unlike Washington, Indiana law "initially assigns each prisoner to Class I" and prisoners are entitled

¶19 Pullman next argues that *Wolff* requires "that where a state provides a statutory right to early release for good behavior," an offender has a protected liberty interest. Supp'l Br. of Pet'r at 7 (citing *Wolff*, 418 U.S. 539). This court has followed *Wolff* and ensured that offenders facing sanctions for serious infractions resulting in a loss of good time credits are given minimum due process. *In re Pers. Restraint of Johnston*, 109 Wn.2d 493, 497, 745 P.2d 864 (1987); *Gronquist*, 138 Wn.2d at 397. DOC followed *Wolff* when it provided Pullman with notice and a hearing for each of his serious infractions.

¶20 *Wolff* is of limited application in the context of determining rights inherent in risk classification changes as the court in *Wolff* was analyzing an offender's "statutory *right* to good time" under Nebraska's system of parole. *Wolff*, 418 U.S. at 557 (emphasis added). Prior to 1984, Washington's parole system was similar to Nebraska's in its statutory provision of good time credits. *See* RCW 9.95.070. However, Washington State's system of parole effectively ended on July 1, 1984. LAWS OF 1981, ch. 137, § 1; RCW 9.95.0001(5). That system of indeterminate sentencing was replaced with a structured determinate sentencing system designed to ensure proportional punishment. *See* RCW 9.94A.010. The Sentencing Reform Act of 1981, chapter 9.94A RCW, replaced parole "good time credits" with the current "earned release time" system. *Compare* RCW 9.95.070, .080 *with* former RCW 9.94A.728. Under the parole system DOC was required to award "time credit reductions" to "[e]very prisoner . . . who has a favorable record of conduct." RCW 9.95.070. Indeed, some vestiges of the parole system still remain. For example, DOC policy continues to provide an offender charged with a serious infraction the right to notice of the infraction and a hearing at which he or she can present evidence and call witnesses. *See* ch. 137-28 WAC.

---

to stay there unless they violate statutorily specified rules. *Id.* Such a statute clearly creates a justifiable reliance on the part of the prisoner. However, "a state may, but need not, create a legitimate claim of entitlement to good-time credits." *Id.* Washington has not created such a claim of entitlement.

¶21 But, there are also significant differences in the nature and treatment of what was formerly "good time credit." Under the current "earned release time" system, offenders *may* earn sentence reductions in accordance with DOC policies, up to the amount allowed by the legislature. Former RCW 9.94A.728(1). This difference between the two systems is significant. Pullman is not petitioning for a restoration of good time credits lost; he is asking that he once again be given the opportunity to earn those credits at a rate of 50 percent. However, the current statutes do not create a protectable liberty interest in that percentage rate: "[t]hat the state holds out the *possibility* of [a 50 percent reduction] provides no more than a mere hope that the benefit will be obtained." *Greenholtz*, 442 U.S. at 11 (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)). Accordingly, the constitutional mandate of *Wolff* and our cases relying on *Wolff* are not before us in the new scheme of "earned release time."

¶22 Pullman could justifiably expect only that DOC would follow its own policy regarding risk classification reassessment. *See Cashaw*, 123 Wn.2d at 147-48. DOC policy ensures that "risk assessment will not be based on unconfirmed or unconfirmable allegations." Supp'l Br. of Resp't DOC, App. 17 (DOC Policy 320.400, at 4). Pullman was allowed to appeal his reclassification to the superintendent and given the opportunity to appear before the facility risk management team when they discussed his reclassification; he waived that right and chose not to appear. Supp'l Br. of Resp't DOC at 11.

¶23 To be certain, Pullman is not precluded from once again becoming eligible for a 50 percent reduction. Policies established by DOC allow that he can be reclassified to an eligible risk category so long as he refrains from violating prison rules and participates in rehabilitative programs as requested.

¶24  The petitioner's personal restraint petition is denied.

ALEXANDER, C.J., and C. JOHNSON, CHAMBERS, OWENS, FAIR-
HURST, J.M. JOHNSON, and STEPHENS, JJ., concur.

¶25  SANDERS, J. (concurring) — Although I concur in the
result reached by the majority, I write separately because I
believe Jay Pullman has a liberty interest in earning up to
a 50 percent reduction in his prison sentence.

¶26  While there is no inherent constitutional right to
earn early release, state statutes and regulations can create
such a liberty interest. *See In re Pers. Restraint of Powell*,
117 Wn.2d 175, 202-03, 814 P.2d 635 (1991). Laws requiring
a particular decision create liberty interests, but laws
granting a "significant degree of discretion" do not. *In re
Pers. Restraint of Cashaw*, 123 Wn.2d 138, 144, 866 P.2d 8
(1994) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454,
463, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989)). Therefore
whether prisoners have a liberty interest to earn early
release turns on whether Washington statutes and regula-
tions give the Department of Corrections (DOC) discretion
or not.

¶27  The majority holds that "[u]nder the statutory
scheme of 'earned early release,' Pullman has no liberty
interest in earning credits at a 50 percent rate." Majority at
209. The majority claims, "The statute is clear; offenders
have no liberty interest in or entitlement to a 50 percent
reduction in their sentence." Majority at 214. I disagree.

¶28  The State conceded Pullman has a liberty interest at
stake in his reclassification, but the majority asserts "there
is explicit statutory language to the contrary" and goes on to
cite RCW 9.94A.7281. Majority at 212 n.4. RCW 9.94A.7281
provides:

> The legislature declares that the changes to the maximum
> percentages of earned release time in chapter 379, Laws of
> 2003 do not create any expectation that the percentage of

earned release time cannot be revised and offenders have no reason to conclude that the maximum percentage of earned release time is an entitlement or creates any liberty interest. The legislature retains full control over the right to revise the percentages of earned release time available to offenders at any time.

The majority misses the point of this subsection. This subsection refers to the legislature's right to revise the statute to allow for a different percentage reduction in earned release time. If the legislature decides to amend the statute to reduce the percentage of earned release time after the inmate has earned early release time, then the inmate does not have a liberty interest in the early release credit lost because of the reduction. This subsection refers to the percentage number of earned release time. But this case involves an inmate's eligibility to earn early release time. From this subsection alone, we cannot conclude that there is no liberty interest in earned release time.

¶29 Former RCW 9.94A.728(1)(b)(ii) (2004) sets forth that "[a]n offender is qualified to earn up to fifty percent of aggregate earned release time . . . if he or she" satisfies various listed criteria. All but one of those criteria deal with objective determinations of whether and what type of felonies the inmate has committed. The remaining criterion, former RCW 9.94A.728(1)(b)(ii)(A), hinges on whether the inmate is classified as an offender who is "in one of the two lowest risk categories" as determined by a risk assessment performed by the DOC, *see* former RCW 9.94A.728-(1)(b)(iii). This criterion also lacks a significant degree of discretion and is led by the statutory mandates in making a determination as to the risk of reoffending. *See Cashaw*, 123 Wn.2d at 144, *quoted by* majority at 212.

¶30 As such, whether an inmate is qualified to earn up to 50 percent of aggregate earned release time is dictated by the " 'substantive predicates' " defined by statute, not any significant discretion granted to the DOC. *Id.* I would therefore hold that Pullman has a liberty interest in his

qualification by statute to earn release time at the rate set forth by statute.

¶31 Since Pullman has a liberty interest, due process protections apply. *In re Pers. Restraint of McCarthy*, 161 Wn.2d 234, 240, 164 P.3d 1283 (2007). But as an inmate, Pullman "enjoys more limited due process rights than a criminal defendant." *In re Pers. Restraint of Gronquist*, 138 Wn.2d 388, 397, 978 P.2d 1083 (1999). When a state attempts to revoke an inmate's state-created liberty interest to early release, the United States Supreme Court has specified the minimum due process procedures that will apply. *See Wolff v. McDonnell*, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). These requirements include notice and an opportunity to be heard. *In re Pers. Restraint of Sinka*, 92 Wn.2d 555, 565, 599 P.2d 1275 (1979). Pullman had a liberty interest to earn early release that could be revoked only if DOC provided the required due process protections.

¶32 DOC's procedures here are sufficient to satisfy minimal due process. First, Pullman's classification was changed based on the four serious infractions he received while incarcerated. Pullman received due process for each of these infractions. Second, soon after the classification counselor noticed an error and updated Pullman's classification, Pullman received a lengthy explanation of the change along with notice of the change. Additionally, Pullman was informed he could appeal to the superintendent, which he did. He was also informed he could review the information in his file used to determine his classification. If there were any errors, DOC would have been able to review those and make the appropriate corrections.

¶33 DOC provided Pullman the required minimal process due for his reclassification, so I agree with the majority that Pullman's personal restraint petition should be denied. But certainly Pullman has a liberty interest to earn a 50 percent reduction in his sentence, thus entitling him to due process, which he received.

¶34 Accordingly, I concur.